# MICHAEL G. O'NEILL
ATTORNEY AT LAW

*Via ECF*

May 4, 2010

Hon. Robert M. Levy
United States Magistrate Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    Mulvey v. Sonnenschein Nath & Rosenthal LLP
             08-CV-1120

Dear Judge Levy:

    I represent the plaintiff.

    At our last conference, you gave me permission to submit an analysis of how plaintiff's third set of written discovery demands relate to the depositions that have been conducted thus far by plaintiff. The purpose of the analysis is to rebut defendant's assertion that these demands open a whole new areas of discovery, as opposed to being principally follow up demands on the discovery and depositions already had.

    That analysis is attached. I believe it is self explanatory. Interrogatories in the third set are quoted in blue, and document requests are in red. I have not addressed the requests for admissions, as they are typically served near the end of discovery in any event and were not in our view subject to the "follow up" principle discussed in earlier conferences.

    Thank you for your consideration of the foregoing.

                                Respectfully yours,

30 VESEY STREET•NEW YORK•NEW YORK•10007•(212) 581-0990•DARROW@ONEILLAW.COM

### Defendant's effort to ensure compliance with its email policy.

Plaintiff's first written demands sought information on this subject. Plaintiff's initial demands, and defendant's responses, were as follows:

*Document Request No.2: Documents describing Defendant's practice and procedure for assuring compliance with the "written workplace policies" alleged by Defendant in its eighth affirmative defense.*

*RESPONSE: Defendant will produce documents responsive to this Request that were in effect during the time that Plaintiff was employed by Defendant to the extent not previously produced.*

*Document Request No.3: All documents relating to Defendant's enforcement of its "written workplace policies" alleged by Defendant in its eighth affirmative defense, including without limitation monitoring or compliance reports, employee warnings or disciplines, or any other documents evidencing any actions taken by Defendant to assure that its workforce complied with said policies.*

*OBJECTIONS: Defendant objects to this Request on the grounds that it is overbroad, is not relevant to the claim or defense of any party, and is not calculated to lead to the discovery of admissible evidence.*

Defendant produced no documents from which it could be ascertained that it took any actions to enforce its email use policy. In order to explore this subject further, plaintiff's Rule 30(b)(6) notice included the following category:

*15.     Sonnenschein Nath & Rosenthal LLP's efforts at assuring compliance with its written workplace policies alleged in its eighth affirmative defense.*

Defendant designated Michael Bamberger, a retired partner, to testify concerning this subject. At his deposition, held March 5, 2010, it was plain that he

was not properly prepared to testify on this subject and was not an appropriate witness:

> *Q. Other than those things that you have just testified to, does the firm take any action to assure compliance with its email policy?*
>
> *A. Other than informing people of it regularly, no. Not that I know of.*
>
> *Q. Well, did you talk to anybody about this subject?*
>
> *MR. FINGER: Other than what was privileged.*
>
> *A. No.*
>
> *Q. The firm employs computer technicians to administer its email system, correct?*
>
> *A. Yes.*
>
> *Q. Did you talk to them to find out whether the firm has instructed them to assist with compliance of the firm's email system?*
>
> *A. No.*
>
> *Q. Did you talk to anybody who informed you one way or another of the involvement of the computer technicians in the enforcement or compliance of the email policy?*
>
> *A. No.*
>
> *Q. Does the firm monitor emails sent by lawyers or other employees of the firm to insure compliance with the email policy?*
>
> *A. Not to my knowledge.*
>
> *Q. Are you qualifying your answer?*
>
> *A. No.*
>
> *Q. Then the answer is no?*

> *A.     No, I'm saying not -- whether there's somebody somewhere that I don't know about that does some monitoring, I can't say, but the firm -- as firm, does not.*

Defendant did produce one of its email technicians, Michael Viscito, however, to testify with respect to other 30(b)(6) subjects. Mr. Viscito testified that defendant has the technical ability to do word searches on all emails in its active server using a software tool called Discovery Attender, published by Sherpa Software:

> *Q.     So what would being able to search PST files have to do with searching the exchange servers?*
>
> *A.     Because the tool was purchased to search the PST files on the archive server, mostly in relation to making sure that the material that the departing attorneys needed to take with them would be able to be located and exported out for them. That same tool also happens to have the capability to conduct the same search against a mailbox on the active exchange server and not just limited to PST files.*
>
> *Q.     When was that tool acquired?*
>
> *A.     I'm not sure.*
>
> *Q.     Do you know the year?*
>
> *A.     Sometime in 2007, late 2007. That's a guess, I'm not sure when we purchased that exactly.*
>
> *Q.     What is that tool called?*
>
> *A.     The name is Discovery Attender.*
>
> *Q.     Was that tool available before 2007?*
>
> *A.     I'm not aware, we never had a need for it, so.*
>
> *Q.     Who is the publisher of that software?*
>
> *A.     I believe the company's name is Sherpa Software, S-H-E-R-P-A.*

> Q. And this tool is able to do a word search on the active exchange server, is that correct?
>
> A. Yes.
>
> Q. And just so we understand what that means, if I were to give you a word such as hippopotamus, you would be able to do a search on the active server for e-mails that contain that word, is that correct?
>
> A. That's correct.

Because of the foregoing, plaintiff served the following follow up demands in an effort to determine whether and to what extent defendant uses readily available technology to enforce its email policy, and if not, why not:

> 1. Documents concerning or regarding Your policy or procedures for reviewing Your electronic mail server or Your electronic mail boxes for communications that You would consider in violation of Your policies or rules concerning the use of Your email system or Internet use.
>
> 2. Documents concerning or regarding the means by which (technical or otherwise) You enforce or can enforce Your email policy for reviewing Your electronic mail server or Your electronic mail boxes for communications that You might consider in violation of Your policies or rules concerning the use of Your email system or Internet use.
>
> 5. Documents concerning or regarding Your decision not to install filtering software to block email that You allege violates Your email policy.
>
> 6. Documents concerning or regarding Your decision not to monitor email boxes for email that You allege violates Your email policy.

**Spoliation of evidence issue.**

Without question, the most disturbing information obtained in the course of the 30(b)(6) depositions was defendant's reckless, arguably willful, failure to preserve electronic evidence relating to plaintiff's claims, resulting in the assured destruction of relevant evidence.

Defendant was arguably on notice that plaintiff intended to make a claim of age discrimination as early as August 1, 2006. Martin Gold, an equity partner at the time, testified that plaintiff mentioned filing a claim or a lawsuit against defendant when he was notified of the decision to terminate his employment on that date. Certainly, defendant was aware of the likelihood of litigation no later than May 14, 2007, when I hand delivered a letter of representation to defendant, together with a copy of plaintiff's proposed EEOC charge of discrimination. By that date, at the very latest, defendant, a sophisticated multi-national law firm, knew of its legal obligation to preserve electronic evidence relating to plaintiff's claims.

Therefore, it was extremely surprising to find out that defendant's email administrator had not been instructed to do *anything* with respect to emails relating to plaintiff until June, 2009, more than two years after defendant was unequivocally on notice of its obligation to preserve evidence, including emails, and then, the only

action taken was to archive the mailboxes of 15 as of yet unidentified attorneys.[1]
Otherwise, according to Viscito, defendant has never searched its email database, active or archived, for emails relating to plaintiff:

> Q.  Before June of 2009 had Sonnenschein done anything to search its e-mail system for e-mail relating to Mr. Mulvey?
>
> A.  No.
>
> Q.  Before June of 2009 did you conduct any search of the backup tapes for e-mail regarding Mr. Mulvey?
>
> A.  No.
>
> Q.  Before June of 2009 did you take any action prevent e-mail relating to Mr. Mulvey from being deleted from Sonnenschein's system?
>
> A.  No.
>
> Q.  To your knowledge did anybody at Sonnenschein take any action before June of 2009 prevent e-mail relating to Mr. Mulvey from being deleted from the system?
>
> MS. SCHMIDT: Objection. That's outside of the scope, I'll direct him not to answer.
>
> \*          \*          \*
>
> Q.  At any time have you performed a search of the active exchange server for e-mail relating to Mr. Mulvey?
>
> A.  No, I have not.
>
> Q.  Have you performed a search on the active e-mail server for any e-mail responsive to Plaintiff's written discovery demand on this lawsuit?

---

[1] Plaintiff's mailbox had already been archived on the date of his termination, pursuant to standard firm policy.

*A.     I am not familiar with discovery demands. I'm not sure about the content. I can tell you the answer is no, because I haven't conducted any.*

*Q.     You're saying that you have never used that software [i.e., Discovery Attender[2]] on the active server, is that correct?*

*A.     For Mr. Mulvey?*

*Q.     I think you said you didn't conduct any. Are you saying any, ever, or are you saying any with respect to Mr. Mulvey?*

*A.     I'm keeping it specific to Mr. Mulvey. No, I have not.*

*Q.     Okay. Are you aware of anybody at Sonnenschein searching the active e-mail server for e-mails relating to Mr. Mulvey?*

*A.     No, I am not.*

*Q.     If that were to be done, would that be done through your team?*

*A.     I'm not sure. The request may come through our team because of the permissions that we have on the e-mail system and we would need to delegate someone else's permission to do that. So I would think that they would probably need to confer with us first, but I'm not sure.*

*Q.     Did anyone else have the permissions necessary to search the entire exchange server?*

---

[2] Significantly, if not ironically, Sherpa Software's website promotes the Discovery Attender product as a litigation tool and lists the following as its features:
- Reduce time and cost associated with e-discovery
- Easy to install, easy to use
- Non-invasive, small footprint
- Produce data in response to subpoenas, requests from inside counsel or court orders
- Manage discovery needs in compliance with the new amendments to the **Federal Rules of Civil Procedures**
- Secure responsive items from PSTs, Exchange mailboxes and loose files
- Robust audit trail logging
- Chain of custody reporting
- Transparent rule creation and search functionality
- Simple interface for search monitoring and review
- Fast and secure system to execute document discovery requests
- Designate search to appropriate parties: Admins, Lawyers, Paralegals, HR, etc.

> *A.     I believe we are the only group that has those permissions, but the security team may also have those. I'm not sure about that.*
>
> *Q.     Does your team have the administrator permissions on the exchange server?*
>
> *A.     Yes, our team does.*
>
> *     *     **
>
> *Q.     Did you take any steps to prevent e-mails relating to Mr. Mulvey from being deleted from the exchange server?*
>
> *A.     Other than the preservation of Mr. Mulvey's mailbox itself and the investigation that we discussed with the security team, no.*
>
> *Q.     Are you aware of anybody at Sonnenschein taking any steps to prevent e-mails relating to Mr. Mulvey from being deleted from the server?*
>
> *A.     I am not aware of any.*
>
> *Q.     Did you receive any litigation hold letters with respect to Mr. Mulvey?*
>
> *A.     No, I did not.*
>
> *Q.     Are you aware of anybody in your department receiving such a letter?*
>
> *A.     I'm not aware of anyone else.*

Mr. Viscito testified that when a user deletes an email from his mailbox, it is deleted permanently after 14 days. Furthermore, defendant's backup tapes are recycled after three weeks. Thus, the longest a deleted email can be retrieved from backup tapes is 5 weeks.

Because of the importance of this issue, plaintiff has served several follow up demands in an effort to obtain relevant information about this failure:

 3. Documents concerning or regarding Your efforts to prevent the deletion or destruction of Documents concerning or regarding the facts underlying this lawsuit, including but not limited to a litigation hold letter, email correspondence or memoranda instructing individuals to preserve Documents and other information during the Relevant Period.

 4. Documents concerning or regarding Your attorneys' efforts to prevent the deletion or destruction of Documents concerning or regarding this litigation, including but not limited to a litigation hold letter, email correspondence or memoranda instructing individuals to preserve Documents and other information during the Relevant Period.

 2. Identify all measures taken to prevent the deletion or destruction of evidence concerning or regarding Mr. Mulvey's employment with You during the Relevant Period.

**Alleged dissatisfaction with Mulvey's work performance issue and reasons for his termination.**

In his deposition, decision maker Michael Barr testified that he was highly dissatisfied with plaintiff's work product and that he made that fact well known in the firm. Mr. Barr also testified that plaintiff's alleged inability to "first chair" a litigation

was a factor in the decision making process. The following demands follow up on that subject matter:

    7.    All Documents reflecting time billed by Robert Mulvey that was written off.

    8.    All email communication to or from Michael Barr concerning or regarding his alleged dissatisfaction with Mr. Mulvey's performance.

    9.    All communications concerning or regarding lawyers' willingness or unwillingness to work with Robert Mulvey.

    12.    Documents reflecting time written off for attorneys in the New York litigation department during the Relevant Period.

    4.    Identify each attorney in the New York litigation group who "is capable of first chairing a litigation and taking it to trial," as testified to by Michael Barr, and each attorney in the New York litigation department who has first-chaired a trial.

**Miscellaneous Subject Matters**

    10.    Documents concerning or regarding Your net worth and profitability during the relevant period.

This follows up on earlier demands made but not responded to.

11. Documents, in electronic format, reflecting the hours worked by associates in the New York litigation department.

This follows up on earlier demands made but not adequately responded to. Witness Andrew Tobin testified to the availability of this information in digital format. It also follows up on Mr. Barr's testimony concerning the New York litigation department's alleged "slow down" prompting the decision to terminate plaintiff's employment.

3. For each year during the Relevant Period, provide the minimum retainer and average retainer charged by You for non-pro bono legal services provided by the New York litigation group.

13. Every bill that you have sent to a non-pro bono or paying client in which you have charged $100 or less for the legal services of an attorney.

These follows up on Mr. Tobin's testimony concerning defendant's counterclaim against plaintiff. Mr. Tobin testified that the economic advantage that plaintiff stole from the defendant was the opportunity for the defendant to perform the services that plaintiff performed "on the side" for which plaintiff was paid $100 per hour. This interrogatory seeks to identify and quantify the amount of work that defendant has performed at the rate of $100 per hour.

1.  Identify every attorney in the New York Litigation department or group during the Relevant Period, including their date of hire, date of departure, reason for departure, date of birth, and job title.

This follows up on an interrogatory seeking very similar information, which defendant was ordered to provide, but which it has not provided either an accurate or updated response.

5.  State the number of attorneys that have worked for You anywhere in the world during the Relevant Period.

This interrogatory is to provide context for some of the information obtained in depositions and requested by the follow up demands, including the requests for admissions. For example, plaintiff expects discovery to establish that no attorney has ever been disciplined by defendant for violation of its email policy. The total number of attorneys employed by defendant during the relevant period will put that fact into context.